UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN BRACY,

     Plaintiff,

v.

CONSUMERS ENERGY COMPANY
and RICHARD T. SCOTT,

     Defendants.

Case No. 2:20-cv-10969
District Judge Mark A. Goldsmith
Magistrate Judge Kimberly G. Altman

_____/

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (ECF No. 51)**

I.     Introduction

This is an unlawful termination case.  Plaintiff Brian Bracy (Bracy) asserts

claims under the Employment Retirement Income Security Act of 1974

(ERISA), 29 U.S.C. § 1001, and Michigan's Elliott–Larsen Civil Rights Act

(ELCRA), M.C.L. § 37.2202(1)(a), based on age, race, and sex, as well as state tort

law.  Defendants Consumers Energy Company (Consumers) and Richard T. Scott

(Scott)[1] have moved for summary judgment on all claims.  Under 28 U.S.C. §

636(b)(1), all pretrial matters were referred to the undersigned.  (ECF No. 30).  For

_____

[1] Defendants will be referred to as Consumers except where appropriate to refer to
Scott individually.

1

the reasons that follow, the undersigned recommends that Defendants' motion be GRANTED.

## II.    Background

The material facts as gleaned from the record follow.

### A.    Overview

Bracy is a Caucasian male who began working for Consumers on January 11, 1993 until his termination in 2019, at the age of 52.  In 2013, Bracy became a Senior Tech Analyst Lead in the Electric Tools, Equipment, and Work Methods and Procedures Department, a position he held at the time of his termination. Amongst others, his duties included supervising three other employees, serving as a "subject matter expert" of "OSHA/MIOSHA," and managing the purchase, distribution, repair, and asset management of tools across electric operations.  The position also involved managing the tool budget by "ensuring appropriate spending and tracking of the O & M and capital tools budget."  (ECF No. 70-1, PageID.2-69 – Corrected Dep. of Bracy).  He also participated on teams and in meetings as needed.  By his own description, Bracy was the "department lead" in the tool department.

In early 2018, Scott became Bracy's supervisor and supervised him for the last year and a half of his employment.  Scott's supervisor was Brad Rickert (Rickert).  Rickert reported to Guy Packard (Packard).

2

As will be explained more fully below, after documented instances by Scott of performance issues, Bracy was placed on a 90 day Performance Correction Plan (PCP) in July of 2019.  At the end of the review period, October of 2019, Bracy was terminated because Consumers determined he had not met the goals and objectives of the PCP.

Bracy has sued Consumers, alleging that his termination after 29 years of employment was not the result of performance issues, but because of discrimination based on his age, race, and gender and was in violation of Consumer's polices for performance evaluations and for being placed on a PCP. He also contends that Consumer's employees, including Scott, made false and defamatory statements about him.  Bracy also says that Consumers violated ERISA by terminating him for the purpose of interfering with his pension benefits.

Consumers contends that Bracy's termination was due to his performance issues and nothing else.  Consumers denies that is termination was discriminatory based on his age, race, or gender or in any way done to interfere with his pension rights.  Consumers also denies that anyone made any actionable defamatory statements against Bracy.

Consumers has moved for summary judgment, contending that there are no genuine issues of material fact as to any of Bracy's claims.  Bracy contends otherwise.  The motion is fully briefed and the record is fulsome.  *See* ECF Nos.

3

51, 57, 58, 61, 62, 63, 70, 72.  The undersigned held a hearing on the motion.  The matter is now ready for a report and recommendation.

> B.      The 2018 PEFD – Evaluating 2017 Performance

In February 2018, Bracy received his first performance evaluation (PEFD) from Scott which evaluated his performance for the 2017 calendar year.  It appears that some of the evaluation was based on feedback from Trent Gilmore, Bracy's supervisor in 2017.  Scott rated Bracy overall as "Effective."  (ECF No. 51-5, PageID.1000 – PEFD).  The evaluation, however, noted that Bracy failed to meet two of the "Periodic Target" areas by failing to "Establish a tool process satisfaction survey and achieve a score of 90% satisfaction by YE 2017" (*Id*., PageID.993) and "Ensure appropriate charges for field tools in 2017 to meet the capital and O&M budget +/-5%" (*Id*., PageID.995).  As to the survey, Scott suggested that Bracy "roll this over to your 2018 goals to accomplish the creation of the automated survey."  (*Id*., PageID.993).  As to the field tools, Scott commented that "Looks like there is some opportunity here."  (*Id*., PageID.995).  Bracy did not object to this evaluation nor does he allege that it was discriminatory.

Later in 2018, Scott experienced performance issues with Bracy.  In April 2018, Bracy did not submit budget information for the headquarters to Scott in time for Scott's meeting with Bracy's third-level supervisor, Packard, Vice

President of Electric Operations.  In an email from Scott to Bracy, Scott writes that it "did not go well for [Scott] or [Bracy] that [Scott] did not have it in that meeting."  Scott gave Bracy another deadline with "no exceptions."  (ECF No. 51-6, PageID.1003 – Email chain).  In response, Bracy apologized and that he "misunderstood" when the information was needed.  (*Id*.)

On July 26, 2018, during an informal feedback session, Scott told Bracy that lifting slings were not tagged for 2018 and that he needed to needed to develop a plan so that the issue is not repeated in 2019.  (ECF No. 51-7, PageID.1013 – Email chain).  During a second informal feedback session on October 23, 2018, Bracy had not developed a plan for tagging the slings.  (*Id*.)

On October 18, 2018, Bracy did not timely transmit budget information to headquarters Field Leaders and Zone Managers, which resulted in an email from a Zone Manager to Scott on October 19, 2018 stating, "I need my capital tool budget.  It is now mid-October and I have not received this information at all this year, and this is unacceptable.  Please send today so I don't need to escalate."  (ECF No. 51-8, PageID.1017 – Email chain).

C.     The 2019 PEFD – Evaluating 2018 Performance

In January 2019, Bracy had another PEFD which covered his performance over 2018.  He again received a rating of "Effective."  However, his performance ratio decreased 15 points from his 2018 PEFD, from 105 to 90.  The ratios within

"Effective" range are 85 to 114.  Thus, Bracy was now at the lower end of

"Effective."  At deposition, Bracy testified that a lower ratio could "possibly"

indicate that an employee is having a bad year.  (ECF No. 70-1, PageID.2064 –

Corrected Bracy Dep).  As noted in the PEFD, Scott had two informal feedback

sessions with Bracy in July and October of 2018 regarding performance issues.

The PEFD also identified four out of six of the categories in the "Knowledge,

Skills and Behavior Feedback" section as "Development Areas:" (1) earning

customers business; (2) crossing the finish line together (teamwork); (3) putting

points on the board (delivering results); and (4) leaving it better than we found it

(continuing to improve).  (ECF No. 51-7, PageID.1009-1010 – PEFD).

After issuance of the 2019 PEFD, Bracy was apparently concerned about his

job because he secretly recorded[2] a March 2019 meeting with Scott where his 2018

PEFD was discussed.  Bracy contends he recorded the meeting because "he

became suspicious of Scott's motives."  (ECF No. 57, PageID.1285 – Bracy's

Response Brief).  A transcript of the recorded meeting reveals that Bracy and Scott

spent a good deal lot of time discussing Bracy's performance issues, with Bracy

---

[2] According to the Consumers' Code of Conduct, recording meetings
without all participants' consent is a violation.  *See* ECF No. 51-9, PageID.1013
(stating in part that "You may not record conversations with others without the
prior consent of everyone involved….[e]xceptions must be approved by the Legal
department, include business purposes such as are recording calls to the Customer
Service or Security command centers").

offering long explanations.  For example, Scott reminded Bracy that part of the

drop in his performance ratio was due to Packard being "livid" about the sling tag

issue, mentioned above.  (ECF No. 51-10, PageID.1022 – Transcript).  Bracy

responded that he did not know Packard was "livid" and asked Scott if he was

going to lose his job if he did not hit "June 30."  (*Id*.).  Scott responded no but

"when you start thinking about things that way, you have to start thinking about

why you even think you could lose your job …"  (*Id*.)  Scott followed up with

stating it was a good thing that the June 30 deadline was met.  Scott also told Bracy

that William Krieger (Krieger), a co-leader of the Field Operations Support (FOS)

Team had noted that Bracy was not attending weekly FOS Team meetings.  Bracy

was a member of the FOS Team and the designated representative from the Tools

department.  Thus, his attendance and participation at FOS Team meetings was

expected and required, as Scott reminded him.  Scott directed him to resume

attending the meetings.  Finally, after discussing Bracy's general job

responsibilities and expectations as a leader of the Tools department, Scott

reminded Bracy that he is manager and the "tool guy" and if Bracy knows

something isn't working, he should look to change it.  Bracy then responded that

changes need resources and financing and that find a different solution and that

"I'm trying to do the best I can . . . . But I'm failing."  (*Id*., Page.ID.1039).  Scott

replied that "there's no bad teams, there's only bad leaders," and that Bracy "can't

say [he's] failing because [his] team sucks," emphasizing that leaders take ownership.  (*Id*.).

After the March 2019 discussion, Bracy's performance issues continued.  In April 2019, Bracy again failed to send budget information out to Field Leaders, prompting their Zone Managers to email Scott and Brad Rickert, Executive Director of Tools and Scott's supervisor.  Scott then gave Bracy a new deadline, and Bracy did not send out the budget information until after Scott sent a final reminder email.  (ECF No. 51-11, PageID.1043 – Email Chain).

Despite being told about the need to attend FOS Team meetings, Bracy attended only one FOS Team meeting in late January 2019.  (ECF No.51-12, PageID.1045 – FOS Meeting Minutes Summary Chart).  According to the Declaration of Krieger, a co-leader on the FOS Team, Bracy failed to show up for meetings and, by his non-attendance, the team was lacking necessary documents Bracy should have brought to the meeting which made the meeting less productive. As a result, Krieger asked Scott to assign someone else to represent the Tools department.  Collin Thelen (Thelen) was assigned to attend the FOS Team meetings in Bracy's place.  However, Krieger stated that Bracy had not prepared Thelen for his role on the FOS Team as Thelen was apparently unaware of his role on the FOS Team.  (*See* ECF No. 51-13, PageID.1047-1048 – Declaration of Krieger).  At deposition, Bracy testified that the decision to have Thelen assigned

to the FOS Team came after Bracy suggesting to Scott that someone else attend and that Bracy had discussion with Brad Rickert about it.  (ECF No. 70-1, PageID.2088 – Corrected Bracy Dep.)

As a result of an incident with a transformer in December of 2018, Bracy was directed to find a sling that would prevent the incident from happening again. In May of 2019, a sling was approved, and Bracy indicated that that an order would be placed such that the slings would arrive around June 1.  As of June 14, the slings had not been ordered.  (ECF No. 51-14, PageID.1049 – Ex 13, Email Re Slings; ECF No. 51-16, PageID.1055 – PCP).

On March 20, 2019, at a Tool and Equipment Reference Manual (TERM) Team meeting, Bracy was directed to complete a New Tool Referral Process (NTRP) requested by the union presidents by June 6.  On May 28, Bracy was reminded to complete the process.  (ECF No. 51-16, PageID.1056 – PCP).  After he did not meet the June 6 deadline, the deadline was extended to July 1, which he also did not meet.  (ECF No. 51-15, PageID.1051 – Email Chain Re NTRP).

### D.    The PCP

As a result of the issues noted above, on July 29, 2019, Scott placed Bracy on a 90-day PCP.  The objective of a PCP "is to correct and resolve employee performance which is not meeting expectation in order to retain the employee as a productive team member."  (ECF No. 15-17, PageID.1064 – Human Resources

PCP Guide).  As part of the PCP, Scott had bi-weekly meetings with Bracy and gave him feedback regarding his progress.

Bracy's PCP outlined his performance deficiencies and had five objective goals which were aimed at correcting those deficiencies.  Bracy does not contend that the goals as written were ambiguous and admits that none went beyond his normal job duties or what was typically expected of him.  The five goals were as follows:

1.  Return as the assigned Tools member to the FOS Team and actively contribute to the FOS Team

2.  Complete the total go live new Tool Referral Process within 30 days (due to missing the July 1 deadline)

3.  Create a monthly meeting schedule for the TERM and hold the meetings, provide an agenda and record meeting minutes

4.  Update headquarter spreadsheets monthly with a communication plan for letting the Zone Managers and Field Leaders know their spend status

5.  Create and submit a draft Mission and Vision statement for his team within 60 days

(ECF No. 51-16, PageID.1056-1059 – PCP).  Bracy acknowledged on the PCP form that he could be terminated if he failed to successfully complete the PCP. (*Id.*, PageID.1062).

Bracy did not meet three of these goals: (1) return and contribute as the assigned Tools member on the FOS Team; (2) complete the New Tool Referral

Process within 30 days (i.e., August 28); and (4) submit a minimum of two months of budgets to the Zone Managers and Field Leaders within 60 days. *See id*.

As to the first goal, Bracy says that it was impossible to meet because he believes Scott and Rickert "permanently" replaced him with Thelen, despite testifying that he discussed having a replacement. Bracy relies on an email between Rickert and Krieger from April 2019 which states that Thelen is "replacing Brian permanently." (ECF No. 51-18, PageID.1070 – Apr 2019 Email Re FOS Replacement). However, as Consumers points out, regardless of whether Thelen replaced Bracy in April, in his July 29, 2019 PCP, Bracy was instructed to return as the assigned Tools member on the FOS Team. Moreover, Scott explained at his deposition that Thelen "was a temporary solution while [Bracy] could not attend FOS." (ECF No. 51-4, PageID.986-987 – Scott Dep.). Scott reinforced the need for Bracy to be a part of the FOS Team and to attend the meetings, which had always been expected of him. *See* ECF No. 51-19, PageID.1071 – 9/16/19 Bi-Weekly Meeting Notes). This was true even if the FOS Team did not want Bracy on the team. *Id*. Bracy requested the goal be removed from the PCP. However, Scott told Bracy during the August 14, August 29, and September 16 bi-weekly meetings that the goal would remain on the PCP. *See* ECF No. 51-20 – Transcript Excerpts of 8/14/19 Meeting; Ex 20, 8/14/19 Bi-Weekly Meeting Notes; ECF No. 51-22 – 8/29/19 Bi-Weekly Meeting Notes.

Once Bracy realized Scott was not going to remove the goal, he proposed that he would set up bi-weekly meetings with Krieger to provide alternate support to the FOS Team.  (ECF No. 70-1, PageID.2095-2096 – Corrected Bracy Dep).  However, the record does not contain evidence that Bracy actually set up regular, recurring meetings with Krieger, as no such meetings appeared on Bracy's calendar.

Ultimately, Scott declined to remove the goal from the PCP because it was Bracy's past actions in not attending meetings and not contributing which prevented him from completing it, emphasizing that "[t]his is the exact performance this plan is seeking to correct."  (ECF No. 51-22, PageID.1113).

As for the second and fourth PCP goals, Bracy testified that he did not complete them.  (ECF No. 70-1, PageID.2089-2091, 2096-2097, 2099-2100).  The New Tool Referral Process (second goal) went "live" by October 7 instead of August 28.  As to the submission of two months of budgets by September 27, Bracy did not transmit his first budget until September 16, and the second until October 14.  (ECF No. 51-23, PageID.1117 – Bracy PCP Notes; 218).  Because of the delays, 20 of 29 Headquarters were over their individual budget spends for 2019.

Bracy testified that after the last bi-weekly meeting on October 23, 2019, he "felt threatened that something could happen based on the responses that [he] was

getting and the feeling [he] was getting from Mr. Scott."  (ECF No. 70-1,

PageID.2109 – Corrected Bracy Dep.).

### E.      The Termination

On November 19, 2019, Bracy was terminated because he failed to

successfully complete the PCP.  The letter further explained that "[a]s an at will

employee, the company may terminate your employment at any time, with or

without cause."  (ECF No. 51-24, PageID.1119 – Termination Letter).

### F.      Consumers' Policies and Bracy's Appeal

Consumers' Employee Handbook outlines the process for employees to

submit complaints and resolve disagreements, including complaints of

discrimination.  *See* ECF No. 51-25, PageID.1120 – Employee Handbook at 2-3, 8-

9).  The Handbook provides that "if informal attempts to resolve the [work-related]

issues are not successful, a formal dispute resolution process is available to resolve

differences."  (*Id*., PageID.1123).  Bracy testified at deposition that he received

training on the Handbook and the Code of Conduct whenever it was available and

understood that the policies therein applied to him.  (ECF No. 70-1, PageID.2060-

2062 – Corrected Bracy Dep.).  Bracy also signed annual checklists acknowledging

that he received various employment policies.  (ECF No. 51-26 – 2019 COC

Certificate of Completion).  Bracy never filed a complaint of discrimination or

harassment during his employment.  Moreover, he testified at deposition that

neither Scott nor Scott's supervisors, Rickert and Packard, ever made any comments about his age, race, or sex.  (ECF No. 70-1, PageID.2113-2115 – Corrected Bracy Dep.).

However, after he was placed on the PCP, Bracy submitted a Request for Dispute Resolution, which was an appeal of being placed on the PCP.  Bracy stated that "While I do agree that the items listed by my supervisor need to be completed the information provided is misleading and does not tell the complete story (Please see attached)."  (ECF No. 57-1, PageID.1691).  The attachments are a detailed narrative from Bracy about his performance and do not mention discrimination as a reason Bracy believed he was placed on the PCP.

### III.    Procedural History

On April 20, 2020, Bracy filed his complaint against Consumers and Scott, asserting the following claims:

I.      Violations of ERISA, 29 U.S.C. § 1140

II.     ELCRA – Age Discrimination

III.    ELCRA – Race Discrimination

IV.     ELCRA – Sex Discrimination

V.      Defamation

VI.     Tortious Interference with an Employment Contract

VII.    Tortious Interference with Business Relationship and Expectancy

14

(ECF No. 1).

Defendants moved to dismiss all claims except Count I, (ECF No. 17), and Bracy filed a motion to compel (ECF No. 25), both of which were referred to the undersigned (ECF No. 30).  The undersigned recommended that Defendants' motion to dismiss be denied (ECF No. 37), which was adopted by the Court without objection.  (ECF No. 38).  The undersigned granted in part and denied in part Bracy's motion to compel (ECF No. 46).  Defendants then filed a motion to compel the return of allegedly privileged documents (ECF No. 48), which the undersigned denied (ECF No. 53).  Defendants objected.  The Court affirmed the denial.  (ECF No. 66).  Meanwhile, Defendants filed the instant motion for summary judgment (ECF No. 51).

<h3 style="text-align:center">IV.    Summary Judgment</h3>

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' " *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson v. Liberty Lobby*, 477 U.S. at 250.  The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249.  Nor does the Court scour the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).  In other words, the Court is not obligated to search the entire record on its own for evidence that would enable a party's claim to survive summary judgment. *See, e.g., Sagan v. Sumner Cnty. Bd. of Edn.*, 501 F. App'x 537, 540 (6th Cir. 2012).

V.     Analysis

A.     Direct Evidence

As an initial matter, Bracy seeks to support his claims under Counts I and II,

(ERISA and ELCRA age) with what he says is direct evidence of discrimination.

In support, Bracy relies on a document which was the subject of Consumers'

motion to compel.  The document that was given to Bracy's counsel, Raymond

Carey, by a member of Consumers' in-house counsel, Robert A. Farr, on February

3, 2020, before this action was filed.  The document consists of a "write up on

PCP," Bracy's 2019 performance goals, a copy of Bracy's PCP, and a short

collection of notes containing demographic information including Bracy's age,

tenure, and notes on discipline and performance.  (ECF No. 50, SEALED

DOCUMENT).  As noted above, Consumers argued that the document with the

handwritten notations was privileged, inadvertently disclosed to Carey, and moved

for its return – a request which was denied.

"Direct evidence is evidence that, if believed, 'requires the conclusion that

unlawful discrimination was at least a motivating factor in the employer's actions.'

" *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011) (quoting

*Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003)).  In

other words, "[d]irect evidence must prove not only discriminatory animus, but

also that the employer acted on that animus." *Johnson v. Metro. Gov't of*

17

*Nashville*, 502 F. App'x 523, 534 (6th Cir. 2012); *see also Lewis v. City of Detroit*, 702 F. App'x 274, 279 (6th Cir. 2017). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Here, the demographic information found on the document is not the sort of evidence which is indicative of direct evidence of discrimination. Rather, the information is similar to evidence which has not been deemed to be evidence of discrimination. In *Iyengar v. Mercy Mem'l Hosp. Corp.*, No. 08-10778, 2009 WL 2840509, at *3 (E.D. Mich. Aug. 31, 2009), the plaintiff offered a notation by one of his interviewers that plaintiff did not want to remain for more than five years if hired as direct evidence of age discrimination. The district court concluded it did not because the notation required one "make[] an inferential leap" that plaintiff's age was in fact the motivation for the decision not to hire plaintiff. *Id*.

Here, one would have to make a similar "inferential leap" that listing "52 years of age, Tenure-26 years, No current discipline on file, and Current performance ratio-90 effective" meant that Consumers terminated Bracy for the sole purpose of interfering with his pension rights and because of his age. Bracy cites *Matras v. Amoco Oil Co.*, 424 Mich. 675 (1986) in support of his argument.

18

In *Matras*, the Michigan Supreme Court found that a reduction plan that divided the workforce into protected and unprotected groups supported an age discrimination verdict because the plan guaranteed that some employees over age 40 would be terminated regardless of their comparable performance levels. Here, a human resources representative listed Bracy's age on a document to be reviewed by counsel evaluating the termination recommendation, which is not the same.

As such, the undersigned will consider whether Bracy has met his summary judgment on each of his claims based on circumstantial evidence.

Each claim will be considered in turn below.

## B. Count I – ERISA

### 1. Legal Standard

In Count I, Bracy alleges claims for interference and retaliation under 29 U.S.C. § 1140 (ERISA § 510). Section 510 of ERISA prohibits employers from terminating, or otherwise discriminating against, employees who choose to exercise a benefit to which they are entitled under their employee benefit plan. *See* 29 U.S.C. § 1140. Specifically, the statute provides that it is "unlawful for any person to discharge ... or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]" *Id*.; *see also*

19

*Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 754 (6th Cir. 2019). Interpreting this statute, the Sixth Circuit has recognized two different kinds of claims under Section 510: "(1) a 'retaliation' claim where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an 'interference' claim where adverse action is taken as interference with the attainment of a right under ERISA." *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 627–28 (6th Cir. 2008); *see also Williams*, 790 F. App'x at 755. The Sixth Circuit has also held that a plaintiff must demonstrate that the defendant had the specific intent to violate ERISA. *See Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997).

Here, Bracy is asserting an interference claim for which courts employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. *See also Stein v. Atlas Indus., Inc*., 730 F. App'x 313, 320 (6th Cir. 2018); *Smith v. Hinkle*, 36 F. App'x 825, 828 (6th Cir. 2002). Thus, to state a prima facie case through circumstantial evidence, Bracy must show that there was: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Crawford v. TRW Auto. U.S. LLC*, 560 F.3d 607, 613 (6th Cir. 2009). If Bracy establishes his prima facie case, he must demonstrate that Consumers' legitimate for his termination is pretextual.

2.    Application

20

Consumers contends that Bracy has not created a triable issue over whether his termination was made with the specific intent of interfering with his entitlement to benefits.  Instead, his claim is based solely on the fact that when an employee is terminated, their benefits are as well.  This is insufficient to show a 510 violation. *See Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1113 (6th Cir. 2001) (mere fact that discharge caused employee to lose opportunity to accrue additional benefits does not satisfy employee's burden; "Otherwise, every employee discharged by a company with an ERISA plan would have a claim under § 510.").

Bracy's deposition testimony confirms that his termination was not connected to any attempt by Consumers to interfere with his pension rights.  Bracy testified as follows:

> Q:   [D]o you have any evidence that they issued the PCP with a specific intent of interfering with your entitlement to benefits?
> A:   I don't recall any.  I can't think of any intent regarding benefits. But overall intent would be to terminate, so they must know that's going to endanger my job and my benefits.
> …
> Q:   You believe that they interfered with your right to benefits because any time someone is terminated, their benefits are terminated?
> A:   Yes.  Absolutely.

(ECF No. 70-1, PageID.2110-2011 – Corrected Bracy Dep.).  Bracy also testified that while he believed it was Scott and Rickert who interfered with his pension rights because of being placed on the PCP, Bracy admitted he did not speak with

21

Scott about his retirement or benefits. (*Id*., PageID.2112). Simply referencing a document which contains a notation of his age and about the length of his tenure (but says nothing about his eligibility for benefits) does not demonstrate a "specific intent to interfere" with his right to attain ERISA-protected benefits. On this record, no reasonable person could conclude that Consumers was motivated to terminate Bracy in order to interfere with his entitlement to benefits, in violation of Section 510. Thus, Bracy has not made out a prima facie case under Section 510.

Moreover, Bracy's reliance on *Humphreys v. Bellaire Corp*., 966 F.2d 1037 (6th Cir. 1992) and *Pennington v. Western Atlas*, 202 F.3d 902, 906-909 (6th Cir. 2000) is misplaced. In each of these cases, the plaintiff/employee presented evidence that they were discharged in close proximity to the date their full retirement benefits were to vest, and that defendants were aware that terminating them would interfere with their receipt of those benefits. By his own testimony, Bracy has no such evidence.

Finally, even if he could establish his prima facie case, for the reasons explained below regarding his ELCRA claims, he cannot demonstrate that the reasons for his termination were a pretext to interfere with his benefits.

        C.      Counts II, III, and IV – ELCRA

           1.      General

The ELCRA prohibits discrimination in the workplace.  Specifically, MCL 37.2202(1)(a) states in relevant part as follows:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

To succeed on a claim under this statute, a plaintiff must show that his employer took adverse action against him, and that his age, race or gender was a "substantial" or "motivating" factor in the decision." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (citing *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 666 N.W.2d 186, 192-93 (2003)).

Circumstantial evidence is evaluated using the familiar *McDonnell Douglas* burden-shifting approach.  *Provenzano*, 663 F.3d at 818 (citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 584 (6th Cir. 2002)); *see also Lytle v. Malady*, 458 Mich. 153, 172-73, 173 n.19, 579 N.W.2d 906, 914-15, 915 n.19 (1998) (applying the *McDonnell Douglas* analysis for age discrimination cases under ELCRA).

Bracy's prima facie case must contain proof of the following elements: (1) he was a member of a protected class; (2) his employer took adverse action against him, such as termination; (3) he was qualified for the position he was fired from; and (4) he was replaced by someone outside of the protected class, i.e. someone

that is younger, non-Caucasian, and female. *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 777 F.3d 303, 308 (6th Cir. 2015) (quoting *Schoonmaker*, 595 F.3d at 264). Alternatively, Bracy can satisfy the fourth element by offering evidence that he was treated less favorably than a younger person who engaged in like conduct. *Provenzano*, 663 F.3d at 818 (citing *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 68 (1997)).

If Bracy succeeds, the burden then shifts to Consumers "to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Tilley*, 777 F.3d at 308 (6th Cir. 2015) (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010)). Bracy would then have the burden to show "that there [is] a triable issue that the defendant's proffered reasons were not true reasons, but were a mere pretext for discrimination." *Lytle*, 458 Mich. at 174. It is not enough for a plaintiff to "raise a triable issue that the employer's proffered reason was pretextual." *Id.* at 175-76. Instead, Bracy must show that it was a pretext for discrimination. *Id.*

## 2.    Application

Consumers says that while Bracy can show that he is a member of a protected class (age, race, and gender) and that he suffered an adverse employment

action in being terminated,[3] he cannot make out a prima facie case of

discrimination because he was not qualified for his position nor was he treated

differently than similarly situated younger, non-Caucasian, female employees.

As to whether Bracy was qualified for his position, "[a]t the prima facie

state, a court should focus on plaintiff's objective qualifications to determine

whether he or she is qualified for the relevant job ... the inquiry should focus on

criteria such as the plaintiff's education, experience in the relevant industry, and

demonstrated possession of the required general skills." *Wexler v. White's Fine

Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003). While Consumers argues

that Bracy is not qualified for the reasons he was placed on the PCP and, after

failing to meet some of the goals, was terminated, this argument proves too much.

The Sixth Circuit has held that "when assessing whether a plaintiff has met her

employer's legitimate expectations at the prima facie stage of a termination case, a

court must examine plaintiff's evidence independent of the nondiscriminatory

---

[3] Consumers contends that placing Bracy on the PCP does not constitute an adverse employment action. However, based on recent Michigan law applying the ELCRA, the issue is not as clear. The Michigan Court of Appeals recently held that a plaintiff's lower performance evaluation, placement on a performance improvement plan, formal counseling, and reduced travel requirements were adverse employment actions sufficient to survive summary judgment. *White v. Dep't of Transp.*, 334 Mich. App. 98, 103-104 (2020). Here, however, it is not necessary to decide whether Bracy's placement on the PCP constitutes an adverse employment action under the ELCRA as Bracy has met this element by being terminated.

reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v Catholic Diocese of Toledo*, 206 F.3d 651, 660-661 (6th Cir. 2000).  In *Williams v. Dep't of Health & Hum. Servs.,* No. 355203, 2021 WL 5027962, at *4 (Mich. Ct. App. Oct. 28, 2021), the Michigan Court of Appeals, found *Cline* persuasive on this point and held that "consideration of the employer's nondiscriminatory reason at the outset 'improperly import[s] the later stages of the *McDonnell Douglas* inquiry into the initial prima facie stage.' " *Id*. (quoting *Cline*, 206 F.3d at 660). Thus, the conduct that led Bracy to be placed on the PCP and later terminated does not go to whether Bracy is qualified for his position.  Considering Bracy's years of experience in working for Consumers, the undersigned finds that he has met the qualification element.

The element of similarly situated, however, is another matter.  "Similarly situated" means that "all relevant aspects" of Bracy's employment situation must be "nearly identical" to the alleged comparable employee's situation.  *Town*, 455 Mich. at 699-700.  To be a similarly-situated employee, that individual "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Hecht*, 499 Mich. at 607 ("our cases have held that the 'comparable' employees must be

26

'nearly identical' to the plaintiff in all relevant respects").

The record does not contain any employee, including employees outside his age, race, or sex, who reported to the same supervisor (Scott), was placed on a PCP, had the same performance issues and failed to complete most of their PCP goals, but were not terminated.

Bracy identified during discovery several individuals that he says are "similarly-situated" but were treated more favorably with respect to their treatment on a PCP, each of whom fall within one or more of his protected categories. As noted in Consumers' brief, the individuals are as follows:

1. B.W – age 50 at termination, Caucasian, female.

2. M.L. – age 50 at termination, Hispanic, female.

3. E.S. – age 56 at termination, Caucasian, male

4. M.W. – age 51 at termination, Caucasian, male

M.L. and M.W., however, were never placed on PCPs. Moreover, none of these individuals worked in the Tools department or report to Scott. Finally, Consumers says that the individual who replaced Bracy, J.A., is in the same protected categories as Bracy, and is older. (ECF No. 51-34, PageID.1148 – Consumers' Supp. Answers to Interrog.). To the extent Bracy argues that no one who had an "Effective" rating was placed on a PCP and later terminated, this argument does

not go to whether a similarly situated person *outside of his protected classes was treated differently*.

Bracy attaches "Exhibit W: Other Employees PCPs." However, he does not explain that any of these employees are similarly situated "in all of the relevant aspects." *Howley v. Fed. Express Corp.*, 682 F. App'x 439, 445 (6th Cir. 2017). Nor does he argue that any of those employees were subjected to a PCP by Scott, much less Rickert. At best, Bracy has identified differently situated people treated similarly, not similarly situated people treated differently. This is not the standard.

Overall, the record fails to show anyone, including employees outside of his protected classes, who reported to Scott, was placed on a PCP and later terminated. Nor can Bracy show he was replaced by someone outside of his protected classes as he was replaced by an older, Caucasian male. As such, Bracy has not meet the similarly situated element under the ELCRA.

However, assuming that Bracy had made out a prima facie case sufficient to survive summary judgment, Consumers has articulated a legitimate non-discriminatory reason for terminating Bracy. Namely, his performance issues leading to being placed on the PCP and his failure to meet all of the goals of the PCP.

Bracy argues that he has shown pretext because that at least 1 of the goals – attending the FOS Team meetings – was impossible to achieve because he was not

wanted back on the FOS Team.  However, as to this point, Human Resources

employee Rebecca Kosnik (Kosnik) EEO and Employee Relations Director of

Consumers Energy testified at deposition that it was appropriate for this goal to

remain on the PCP, explaining that "he still could have attended the meetings, but

the team members did not want him to participate because of his ineffectiveness

and behavior towards them. … it could be appropriate that somebody has the goal

to attend a certain meeting even if they're not an official team member."  (ECF No.

51-3, Page.ID.982 – Dep. of Kosnik).  Moreover, although the FOS Team did not

wish for Bracy to participate, there is no evidence that he was prevented or

otherwise excluded from attending any meetings.  Thus, this does not show pretext.

Bracy also contends that because employees with an "Effective" overall

rating on their most recent PEFD, as was Bracy, cannot be subject to a PCP under

Consumers' policies and therefore, Consumers' violation of its own policies is

indicative of pretext.  In other words, Bracy contends that only employees who

have a PEFD rating of "Needs Improvement" or "Underperforming" may be

placed on a PCP.  This argument does not carry the day.

Consumers' PCP Leader Consulting Guide contemplates PCPs that are

based on mid-year performance deficiencies:

> Q) When should I implement a PCP?
> A) Performance Correction Plans should be implemented when an
> employee's overall performance rating is 'Under Contributing' or
> 'Moderate,' *or if the supervisor determines the employee's current*

29

> *performance requires immediate improvement after the supervisor has held prior discussions with the employee and has communicated expectations.*

(ECF No. 51-17, PageID.1067 – PCP Guide at page 4) (emphasis added).  Here, Scott determined that Bracy's performance warranted placement on a PCP.

 Kosnik also explained at deposition that "adequate notification of performance issues" would be based on "period check-ins with the employee," "informal feedback," "coaching," or "any method."  (ECF No. 51-3, PageID.979 – Kosnik Dep.).  Kosnik further explained:

> …In Mr. Bracy's case his PCP did not come immediately following the PEFD.  If an individual's PEFD rating is in the last category a PCP is required.  But any time in the year regardless of how one was rated in the PEFD and what the PEFD said, if someone's performance has declined or there's been incidents that have come to light since the PEFD a PCP can issued and that was the situation with Mr. Bracy.

(*Id.*, PageID.980 – Kosnik Dep.)   Kosnik further testified at that a failure to improve in a "Development Area," which was noted in Bracy's 2019 PEFD, could justify issuance of a PCP.  (*Id.*, PageID.981).

Thus, Bracy's placement on the PCP was within Consumers' policy that a need for a PCP could arise mid-year and is not necessarily tied to the employee's most recent PEFD rating.  In short, having an "Effective" rating on a PEFD does not insulate an employee from being placed on a PCP until their next review.  Indeed, Bracy's appeal of being placed on the PCP was reviewed and denied by human resources personnel because the "[e]vidence was sufficient to support

30

Performance Correction Plan."  (ECF No. 51-28, PageID.1128 – PCP Appeal

Response).

In his response, Bracy sets forth seven pieces of "evidence" which he says

show pretext, phrased by Bracy as follows:

(1) Defendant Scott was uninformed about Plaintiff's actual job duties, responsibilities, and accomplishments;

(2) there was no legitimate justification for the PCP since Plaintiff's most recent 2018 PEFD rating had been "Effective," Defendant Scott knew that reasons he propounded as support for the PCP were false, and the PCP included goals that Defendant Scott knew were not "realistically achievable and measurable";

(3) instead of issuing a PCP to Plaintiff, Defendant Scott should have conducted the overdue 2019 PEFD informal feedback session with Plaintiff, engaged in coaching of and informal, formal and structured discussions with Plaintiff, provided him with written job expectations and/or a targeted development plan, and/or given warnings with notice of potential consequences of any failure to heed warnings as the means to address any arguably legitimate concerns about Plaintiff's job performance;

(4) Defendants also did not abide by Consumes' PEFD and PCP policies and practices after subjecting Plaintiff to the PCP, i.e. they did not provide Plaintiff with constructive feedback or guidance indicative of their support for Plaintiff's demonstrated efforts to timely achieve the realistically attainable goals of the PCP;

(5) Plaintiff nevertheless had timely achieved the achievable goals of the PCP and ad proposed an alternative means to satisfy the FOS Team related goal that had been deemed acceptable by Mr. Krieger, the FOS Team co-leader; and

(6) Defendant Scott and Messrs. Rickert and Packard had pre-judged the outcome of the PCP.

31

(7) even had Plaintiff not timely achieved any of the PCP goals, he had demonstrated that he was committed to improvement and, as a consequence, he should have been granted, at a minimum, an extension of the PCP but for the pre-determination of the PCP outcome by Defendant Scott and Messrs. Rickert and Packard.

(ECF No. 58, PageID.1895-1897 – Response Brief).

None of these statements support a finding of pretext.  As to (1), even if Scott was unfamiliar with some of Bracy's job duties, the record of communications between Scott and Bracy, and the PCP itself, show that Scott understood Bracy's position and believed that Bracy was underperforming.  As to (2), (4) and (5), as discussed above, the PCP Guide permits placement on a PCP and the PCP itself lays out in detail Bracy's performance issues.  As to (3), this is an attack on Scott's decision to place Bracy on a PCP instead of taking other action which Bracy does not explain why Scott was obligated to take the alternative actions.  As to (6), Scott testified that he did discuss with Rickert and Packard that the possible outcome of Bracy's PCP was termination, but that discussion came towards the end of the 90-day period, and therefore the outcome could not have been "pre-judged."  *See* ECF No. 62, PageID.1946 – Scott Dep.  As to (7), Bracy's own belief that he should have had the PCP extended is not evidence of pretext.

Overall, the record fails to show evidence to create a genuine issue of material fact as to whether Bracy was terminated not because of his failure to meet the goals of the PCP but rather because of his age, race, or sex.

D.  State Tort Claims: Claim V – Defamation, Claim VI – Tortious Interference with an Employment Contract, and Count VII – Tortious Interference with a Business Expectancy

1.  General

To state a claim for defamation under Michigan law, a plaintiff must allege the following:

> 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication.

*Nichols v. Moore*, 477 F.3d 396, 399 (6th Cir. 2007) (quoting *Rouch v. Enquirer & News,* 440 Mich. 238, 251 (1992)).

The elements of a tortious interference claim are: (1) the existence of a valid business relationship or expectancy (enforceable contract not required); (2) the knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted.  *See Saab Auto. AB v. Gen. Motors Co*., 770 F.3d 436, 440 (6th Cir. 2014); *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc*., 323 F.3d 396, 404 (6th Cir. 2003).

The defendant's interference must be "an act that is per se wrongful" or "a lawful act with malice and that is unjustified in law."  *Feaheny v. Caldwell*, 175

Mich. App. 291, 302 (1990).  Improper conduct is a subset of wrongful acts and includes illegal, unethical, or fraudulent activities.  *Id.* at 304.  "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference."  *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 78 (2003) (quoting *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 698–99 (1996)).  A plaintiff can establish a claim for tortious interference with an at-will employment relationship.  *Patillo v. Equitable Life Assurance Soc'y*, 199 Mich. App. 450, 457 (1993).

2.    Application

As to Bracy's claim for defamation, Consumers asserts the same arguments in support of summary judgment as it did in its motion to dismiss.  That is, Consumers argues that these statements are not actionable, as they were made internally to "other employees of Consumers Energy who were part of Plaintiff's performance review process," citing *Royal Palace Homes v. Channel 7 of Detroit*, 197 Mich. App. 48, 51 (1992) and *Ireland v. Edwards*, 230 Mich. App. 607, 614 (1998).  Consumers also argues that statements made to fellow employees "whose duties interest them in the same subject matter" are subject to a qualified privilege.

As to tortious interference, Consumers argues, as it did in its motion to dismiss, that Bracy has not met the "heavy burden" of showing that Scott acted

34

outside of the scope of his authority, citing *Coleman-Nichols v. Tixon Corp*., 203

Mich. App. 645, 657 (1994), and that Scott did not act solely for his own benefit

with no benefit to Consumers, citing *Reed v. Mich. Metro Girl Scout Council*, 201

Mich. App. 10, 13 (1993).

In response, Bracy does not address these claims or the Consumers' legal

arguments at all, aside from making conclusory statements in in the Counter-

Statement of Issues and a footnote in which he refers to the "evidence" and cites

large segments of testimony.  This is insufficient.  *See McPherson v. Kelsey*, 125

F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.  It

is not sufficient for a party to mention a possible argument in the most skeletal

way, leaving the court to ... put flesh on its bones." (citations omitted)).  Moreover,

"a district court is not required to search the record to determine whether genuine

issues of material fact exist when the non-moving party has failed to point them

out." *Wardle v. Lexington-Fayette Urban Cnty. Gov't*, 45 F. App'x 505, 509 (6th

Cir. 2002).  While Bracy's defamation and tortious interference claims survived

dismissal, at the summary judgment stage Bracy is required to do more than point

to the alleged defamatory statements and tortious acts.  Rather, he needed to

address Consumers' arguments that the statements fell outside of the realm of

defamation because they were made internally and within the scope of the

employees' authority and therefore protected by a qualified privilege.  Bracy failed to do so.  Under these circumstances, Bracy has failed to come forward with sufficient evidence and argument to save his state tort claims from summary judgment.

## VI.    In Sum

The undersigned does not question Bracy's sincerity in believing that he was unfairly and unjustifiably placed on a PCP, nor his belief that the goals of the PCP were unfair and unjustified and that he should not have been terminated.  The undersigned also realizes that Bracy believes that Scott could have or should have done more or different things which may have had a different outcome.  As a long term employee, the fact of termination is more acute.  However, the record simply fails to show a genuine issue of material fact as to whether Bracy's inability to meet the goals of the PCP which led to his ultimate termination were the result of unlawful discrimination based on Consumers' desire to interfere with his pension rights or because of Bracy's age, race, or sex.  Nor is there evidence to support the allegations on his state tort claims sufficient to go to a jury.  Rather, Consumers has put forth a record which contains documented instances of performance issues which led to placement on a PCP with objective goals that Bracy, unfortunately, failed to achieve.

VII.   Conclusion

Accordingly, for the reasons stated above, the undersigned RECOMMENDS

that Defendants' motion for summary judgment be GRANTED.


Dated: February 2, 2022                           s/Kimberly G. Altman
Detroit, Michigan                                 KIMBERLY G. ALTMAN
                                                  United States Magistrate Judge


**<u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>**

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," etc.  Any objection must recite precisely the provision of this Report and

37

Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 2, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager